IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MARLON H. VANHOOK,

    Defendant.

Case No. 21-CR-30162-SPM-1

# MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Pending before the Court are Motions to suppress evidence and a statement filed by Defendant Marlon H. Vanhook. (Docs. 77, 78). The United States (the "Government") filed a response to the Motion. (Doc. 84). After an initial evidentiary hearing, Vanhook filed a memorandum in support of the Motions. (Docs. 90, 94). The Government then filed a reply. (Doc. 96). A second evidentiary hearing was later held for Vanhook to testify in support of suppression. (Docs. 98, 102). For the reasons set forth below, the Motions are **DENIED**.

## FACTUAL & PROCEDURAL BACKGROUND

In October 2021, a grand jury returned a one-count indictment against Vanhook that charged him with possession with intent to distribute methamphetamine. (Doc. 2).

Vanhook filed motions to suppress evidence and statements obtained pursuant to his encounter with police and the search of his hotel room (Doc. 84). Vanhook argued that he did not give consent for agents to search his hotel room and that any

incriminating statement made during that time was the result of a custodial interrogation in the absence of a *Miranda* warning. The Government argued that Vanhook consented to the search and the agents were not required to provide Vanhook with his *Miranda* rights because he spontaneously volunteered information about methamphetamine in the room to agents after consenting to search. The Government additionally contended that the agents would have inevitably discovered methamphetamine in the hotel room without consent or the statement because they had probable cause and would have obtained a search warrant for Vanhook's motel room if he denied consent.

In September 2023, the Court held an evidentiary hearing and agents testified regarding a traffic stop and their subsequent encounter with Vanhook at the hotel that led to the search of his hotel room. In March 2021, Fairview Heights police conducted a traffic stop of three individuals who were found to be in possession of roughly three and a half ounces of methamphetamine. (Doc. 93, p. 7). Law enforcement officers developed information that these individuals had obtained their drugs from an individual known as "Ace." (*Id.* at 8). One of the arrestees identified Vanhook as the supplier and law enforcement ultimately suspected that "Ace" was Vanhook. (*Id.*). The arrestees told law enforcement that they purchased the methamphetamine from Vanhook at a motel in Caseyville, Illinois. (*Id.* at 8). One of the arrestees engaged in monitored calls with the individual they claimed was Vanhook. (*Id.* at 10-11; Hr'g Exs. 1-4). DEA records associated the number the arrestee called with Vanhook. (Doc. 93, p. 11). These monitored calls led federal agents to a motel and ultimately to Vanhook's room. (*Id.* at 11-16). A group of agents

went up to Vanhook's room and took him into custody on suspicion of narcotics trafficking. (*Id.* at 16-17). As soon as Vanhook opened the door, DEA Agent Ryan Bandy said he saw a bag of Epsom salt which he alleged was a known cutting agent for methamphetamine. (*Id.* at 69, 70-71; Hr'g Ex. 12). Vanhook was placed in handcuffs and removed from the room. (Doc. 93, pp. 17, 51, 69). A safety sweep of the room was conducted where agents saw another bag of Epsom salt. (*Id.* at 17, 75; Hr'g Ex. 11). Law enforcement described Vanhook post-arrest as "a little bit upset, a little – maybe a little loud," but not "resistive or combative." (Doc. 93, pp. 18, 51-52).

Post-arrest, Bandy handed Vanhook off to Officers John Simmons and Timothy Birckhead, who brought him downstairs to a law enforcement vehicle. (Doc. 93, pp. 18, 21-22, 51, 69). While in the vehicle, Simmons and Birckhead did not Mirandize Vanhook. (*Id.* at 22, 55). Simmons asked the defendant for consent to search the hotel room. (*Id.* at 20, 53). Birckhead stated that Vanhook didn't decline consent to search his hotel room, but he was a little bit hesitant. (*Id.*). The officers then told Vanhook that if he didn't give consent they would apply for a warrant. (*Id.* at 20, 36, 53). Simmons claimed that at the time, they could have obtained a warrant, but they wanted to move a little faster than applying for warrant allowed for. (*Id.* at 61). Bandy stated that he believed they could have obtained a search warrant as well. (*Id.* at 73). Simmons and Birckhead stated that because of their assertion about applying for a warrant, Vanhook gave consent to search his room and made a statement about the location of the drugs. (*Id.* at 20). Simmons and Birckhead admitted Vanhook's consent to search was not recorded and a consent to search form was not executed to memorialize Vanhook's consent. (*Id.* at 20, 35, 59, 60). Birckhead also revealed that

when he testified to the Grand Jury, he incorrectly told the grand jurors that Vanhook had been Mirandized when he was in the police vehicle. (*Id.* at 22). Birckhead explained the incorrect statement during his grand jury testimony as "misspeaking." (*Id.* at 22, 39). Simmons and Birckhead stated that Vanhook was not interrogated in the vehicle and they did not ask him any questions about the investigation. (*Id.* at 23, 55). Simmons stated that after Vanhook's consent and statement, he went back to the room to pass along the information to Bandy and help search the hotel room. (*Id.* at 53, 74). A subsequent search of the room revealed the presence of methamphetamine in a black bag that also contained Vanhook's photo identification from the state of Texas. (*Id.* at 54, Hr'g Ex. 9).

Video at the DEA Fairview Heights office after the search shows the post-search interview between the agents and Vanhook. (Doc. 85, Ex. 5). Vanhook was Mirandized before the interview. Early on in the interview, Simmons stated "[s]o listen man, I, I listen. And I know everything got off on the wrong foot, but I want to thank you for cooperating, alright . . . first of all, and giving us consent to search . . . ." (*Id.*) Vanhook nodded up and down during the statement before saying, "[y]essir." (*Id.*) Simmons stated during the evidentiary hearing that because the consent was not recorded and they did not use a consent form, he went into the interview knowing that he wanted Vanhook to acknowledge his verbal consent. (Doc. 93, p. 56).

In November 2023, the Court held another evidentiary hearing and Vanhook testified regarding his encounter with law enforcement that led to the search. He admitted that he sometimes used the nickname "Ace," but only dealt marijuana, which he sold for $300 per half-ounce. He claimed that Simmons grabbed him and

Page 4 of 9

slammed him against a wall in the hallway when he answered the door. He asserted that he did not give Simmons and Birckhead consent to search his room and said that they kept asking him whether he had drugs or guns in the room. He stated that he lied to agents during the post-search interview about the people he obtained methamphetamine from. When asked why he nodded in agreement, indicating that he gave consent when interviewed at the police station, he recounted that agents told him to follow their lead. He also suggested that the narcotics in his room were planted in the black bag, which he had never seen before, along with his identification card. When asked about the bags of Epsom salt in his hotel room, he stated that he had a skin condition called tinea versicolor and, as a treatment, he used a whole bag of Epsom salt along with peppermint oil and apple cider vinegar to soak in a bathtub three times a week.

## LEGAL STANDARD

A motion to suppress seeks to exclude evidence obtained in violation of a defendant's constitutional rights.

The Fourth Amendment provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The Supreme Court has explained that "[i]n order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, this Court long ago conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." *Simmons v. U.S.,* 390 U.S. 377, 389 (1968). The Fourth Amendment generally prohibits the

warrantless entry of a person's home or hotel room to search for specific objects. *See Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990). However, this prohibition does not apply to situations in which voluntary consent has been obtained from the individual whose property is to be searched. *Id.* Put another way, warrantless searches are permissible if the police received voluntary consent to search. *See U.S. v. Hicks,* 650 F.3d 1058, 1064 (7th Cir. 2011).

Regarding the suppression of statements, to protect an individual's right against self-incrimination, a suspect must be advised of certain rights prior to being subjected to custodial interrogation. *See Miranda v. Arizona,* 384 U.S. 436, 444 (1966).

## ANALYSIS

In his Motion to exclude evidence, Vanhook alleged that the warrantless search of his hotel room was violative of the Fourth Amendment because he did not give consent to the agents on the scene. It is important to note at the outset that Vanhook is not challenging the initial safety sweep of the room, nor has he claimed his consent was involuntary, which obviates the need look at consent under the factors in *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973). As a result, this issue boils down to the credibility of the agents and the credibility of Vanhook to determine if Vanhook verbally consented or not. "The government has the burden of proving consent by a preponderance of the evidence." *U.S. v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010).

The Court finds that Bandy and Simmons were credible and consistent as to facts about which they had personal knowledge. This assessment is based on their demeanor while testifying and the consistency of their material testimony with other

evidence in the case, including the recorded post-search interview. What is more, the Government's assertion that Vanhook gave consent makes sense because the agents alerted him to the realistic prospect, which the Court will address later, of obtaining a search warrant. Focusing in individually on Birckhead's testimony, while he incorrectly represented to the Grand Jury that Vanhook was Mirandized in the vehicle, his testimony was credible for these reasons as well.

The Court additionally finds that Vanhook was not credible as to facts about which he had personal knowledge. This assessment is based on his demeanor while testifying, the lack of consistency of his material testimony with other evidence in the case, including the statement that he lied to agents during the post-search interview about the people he obtained methamphetamine from, and peculiar assertions that are likely untrue or exaggerated.

As a result, the Court credits the agents' testimony and discredits Vanhook's testimony. Thus, the Government satisfied its burden of establishing, *by a preponderance of the evidence,* that Vanhook gave oral consent to the agents to search his hotel room.

Moreover, "the doctrine of inevitable discovery provides that illegally obtained evidence will not be excluded if the Government can prove, by a preponderance of the evidence, that the officers 'ultimately or inevitably would have . . . discovered [the challenged evidence] by lawful means.'" *U.S. v. Marrocco,* 578 F.3d 627, 637–38 (7th Cir. 2009) (quoting *Nix v. Williams,* 467 U.S. 431, 444 (1984)). The Government can meet this burden by showing two things: "First, it must show that it had, or would have obtained, an independent, legal justification for conducting a search that would

have led to the discovery of the evidence; second, the Government must demonstrate that it would have conducted a lawful search absent the challenged conduct." *Id.* at 637–38 (citing *United States v. Brown,* 64 F.3d 1083, 1085 (7th Cir. 1995)).

Based upon the investigation into Vanhook's drug dealing activity prior to his arrest at the hotel, including the four recorded phone calls along with agent testimony of cutting agents, DEA records that identified the number as Vanhook's, and original arrestee identification of Vanhook, officers had independent probable cause that Vanhook had distributed methamphetamine from the hotel room and had more drugs inside the room to resupply customers. Additionally, agents stated during their testimony that if Vanhook didn't give consent, they would have applied for a warrant. So, *by a preponderance of the evidence*, regardless of whether Vanhook gave consent or not, the evidence would have been discovered and the warrantless intrusion was harmless.

Vanhook also contended that his alleged statement regarding the location of the methamphetamine was made while under custodial interrogation and without being read *Miranda* warnings. The Government does not contest that Vanhook was in custody at the time. "[T]he essential element of a custodial interrogation is coercion." *U.S. v. Salyers,* 160 F.3d 1152, 1159 (7th Cir. 1998) (quoting *United States v. Martin,* 63 F.3d 1422, 1429 (7th Cir. 1995). The only question here is whether the agent's representation that Vanhook's comment about the location of the drugs was a spontaneous statement (and thus outside of the *Miranda* requirements) versus a coerced statement made under questioning. The Government claimed that the statement was spontaneous without questioning, while Vanhook stated that the

agents peppered him with questions in the vehicle about whether he had drugs and guns in the room.

For the reasons previously stated, the Court again credits the agents' testimony and discredits Vanhook's testimony. Thus, the Government satisfied its burden of establishing, *by a preponderance of the evidence,* that Vanhook was not interrogated and gave a statement spontaneously.

## CONCLUSION

For the foregoing reasons, Defendant Marlon H. Vanhook's Motions to Suppress Evidence (Docs. 77, 78) are **DENIED**.

**IT IS SO ORDERED.**

**DATED:** December 20, 2023

*s/ Stephen P. McGlynn*
**STEPHEN P. McGLYNN**
**U.S. District Judge**
